THE RECEIVERS OF THE NEW JERSEY MIDLAND RAILWAY COMPANY, appellants, and WORTENDYKE and others, respondents.

1. Conventional subrogation can only result from an express agreement either with the debtor or creditor.  It is not sufficient that a person paying the debt of another should do so merely with the understanding on his part that he should be subrogated to the rights of the creditor.

2. The right of subrogation cannot be enforced until the whole debt is paid.  And until the creditor be wholly satisfied, there ought and can be no interference with his rights or his securities, which might, even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim.

3. The ordinary duties of a receiver in a foreclosure suit are in aid of the mortgagee, by collecting the rents and preserving the property from loss and decay.  In railway foreclosures, his duties, though more extensive, are primarily the same; the appointment is presumed to be for the benefit of the mortgagees and for the protection of their interests.

4. Parties claiming an equitable lien upon rolling stock furnished to an insolvent corporation, by virtue and to the extent of advancements made on account of the same, will not be entitled to be heard upon petition,

pending foreclosure proceedings upon a mortgage covering the rolling stock and all other property of the corporation, upon which rolling stock other liens are set up by answer, claimed to be paramount to the mortgage of the complainants.

This case, in the Court of Chancery, is reported *ante, p.* 110.

*Mr. Gilchrist,* for appellants.

*Mr. J. Linn,* for respondents.

The opinion of the court was delivered by
GREEN, J.

This appeal is taken from an order of the Court of Chancery, made on the petition of Cornelius A. Wortendyke, late president of the New Jersey Midland Railway Company, in a suit commenced for the foreclosure of the first mortgage on the real and personal property of that company. The bill was filed by Coe and Opdycke, trustees of the bond-holders, in March, 1875, and on the 2d of April following, receivers were appointed to take charge of the property and to operate the road for the benefit of all parties interested, during the pendency of the foreclosure suit. The company had previously been declared insolvent on a creditors' bill filed for that purpose, and a receiver appointed in that suit. The appeal is prosecuted in the name of the receivers, by certain bond-holders allowed to come in for that purpose, the trustees under the mortgage not appearing.

The petition was filed August 9th, 1875, and alleges that the company, before it was declared insolvent, being in an embarrassed condition, purchased or rather leased, a large amount of locomotives and rolling stock, to be paid for by monthly instalments, and to remain the property of the vendors until the whole amount of the purchase money should be paid. That in order to preserve the property for the benefit of the company and its creditors, the petitioner and eight others named in the petition, then directors and officers

of the company, advanced and paid, on account of said rolling stock, to the several owners thereof, about $17,000, with the understanding that they should, upon the payment of the balance due thereon, themselves become the owners of the stock, and hold the same for the benefit of the company until their advancements were re-imbursed to them by said company. The petitioner asks that he and his associates may be subrogated to the rights of the vendors of the rolling stock, to the extent of the advancements made by them on account of the same, and that the receivers should pay to the petitioner and others the amount of money by them respectively advanced, with interest.

The case, as here presented, does not entitle the petitioners to a decree for subrogation. They do not, in their petition, claim to stand as guarantors on the contract, or that they were in any way held or bound for its performance. They only allege that they made the advances with the understanding that they should be subrogated to the right of the owners of the rolling stock, to the extent of such advancements. I have been unable to find, either in the petition or evidence, anything to show an agreement with the original debtor or creditor, that these parties should be entitled to subrogation or to stand in the place of the vendors of the stock. It is not sufficient that a person paying the debt of another should do so merely with the understanding on his part that he should be subrogated to the rights of the creditor. Conventional subrogation can only result from an express agreement either with the debtor or creditor. *Dixon on Subrogation, pp.* 1, 10, 167 ; *Bouvier's Law Dic., title Subrogation ; Sandford* v. *McLean,* 3 *Paige* 116 ; *Shinn* v. *Budd,* 1 *McCarter* 234.

There are other serious objections to a decree for subrogation, as the case now stands. It appears, by the evidence, that contracts for the purchase of cars and engines were made by the Midland Railway Company with five different parties, amounting in the aggregate to a very large sum ; that the money advanced by the petitioners was passed into the treasury of the railway company, and paid by the checks of that company

to the owners of the rolling stock. It is not shown upon what particular contract or contracts these moneys were paid, nor in what proportions on the different contracts, if more than one. The first witness, one of the parties claiming under the petition, thinks payments were made on all the contracts; the other witnesses speak of payments on the contracts and payments for rolling stock, without attempting to specify on what contract, or to what owner of stock, the advances were made.

The whole evidence upon this point, is vague and indefinite, and fails to establish the essential facts upon which a decree for subrogation must be founded.

It is, however, insisted on behalf of the petitioners, that the advances were made by the directors and officers of the company for the protection and preservation of the property entrusted to their care; that they occupied the position of trustees, and are entitled to an equitable lien on the trust property, and to re-imbursement out of the trust fund produced by its use or realized from its sale. If such lien were created, the application and order for its enforcement are prematurely made and cannot be sustained.

Whatever equitable rights these parties may have, they are subordinate to those of the owners of the rolling stock. The payments to be made by the company upon these contracts, extended through different periods of time, from two to five years. The final payment on the contract printed in the state of the case, is not payable until December 23d, 1876, and on the Adams contract, not until June, 1879. During all that time the vendors remain the owners of the stock, with power, in case of default on the part of the railway company, to take possession of and remove the property; and only upon full and final payment was the title to vest in the company.

The right of subrogation cannot be enforced until the whole debt is paid; and until the creditor be wholly satisfied, there ought and can be no interference with his rights or his securities, which might, even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim. *Dixon on Subrogation* 123; *Kyner* v. *Kyner*, 6 *Watts* 227;

*Neptune Ins. Co.* v. *Dorsey*, 3 *Md. Ch.* 338 ; *Swan* v. *Patterson*, 7 *Md.* 167.   The same principle applies to the claim of the petitioners, as now presented.

The order appealed from not only gives the right of subrogation, but also directs the receivers that if, in their judgment, it is for the interest of the creditors that said receivers retain the possession of the rolling stock in the operation of the railroad, then that they pay out of the first moneys which may come into their hands as such receivers, to the petitioners, the amount of their advances, with interest.   Whatever money comes to the receivers' hands in the management of the road, must arise from the earnings of the rolling stock, and constitutes the only fund out of which the monthly payments to the owners are to be made.   To appropriate any part of such earnings to the payment of these petitioners' claims, or to give them any lien upon, or right to the rolling stock, concurrent with the rights of the owners, or subject thereto, would be a direct interference with their rights and securities, and might greatly prejudice them in the collection of the residue of their claims, and in the enforcement of their right to the control of the property which constitutes their only security.   The order, in effect, places the petitioners in a better position than the owners of the stock, by giving them a prior right to the only fund out of which payment can be made to either party.

These proceedings are prematurely taken in another point of view ; they are had in a foreclosure suit.   The advances were made, and the petitioners' rights accrued long before the filing of the bill.   The payment of these claims by the receivers is in no wise necessary for the preservation of the property, or to the protection of the rights of the complainants or other creditors.   The petitioners stand in a different position from the owners of the rolling stock.   They have no power to embarrass the receivers by removing the property.   Their rights, if any they have, can only be established by the aid of a court of equity.

The ordinary duties of a receiver, in a foreclosure suit, are in aid of the mortgagee, by collecting the rents and preserving

NOVEMBER TERM, 1876. 663

the property from loss and decay. In railway foreclosures, his duties, though more extensive, are primarily the same. The appointment is presumed to be for the benefit of the mortgagees, and for the protection of their interests. In this case, it is claimed that the mortgage covers the rolling stock, and that upon full and final payment by the company, or by the receivers to the owners of the stock, the title thereto will vest in the company, or their mortgagees, and enure to the benefit of the bond-holders. The petitioners seek, at this early stage of the foreclosure suit, and in this irregular mode, to enforce a lien alleged by them to be superior or prior to that of the complainants. In this view, it is simply a contest for priority between parties claiming liens upon the mortgaged premises. Two of these claimants are trustees under a chattel mortgage covering a large part of the rolling stock of the road, and have, by answer, set up that mortgage as a lien prior to that of the complainants. There may be, and probably are, other parties claiming liens upon the property. They may have or claim equities prior or superior to those of the petitioners. They all have a right to be heard on this question. Upon the hearing of the cause, or at other proper time, the court will settle and adjust the respective rights and priorities of all parties claiming liens upon the mortgaged premises. There is no necessity, or apparent propriety, for the settlement of this question at this time.

The order appealed from should be reversed, but without costs, and without prejudice to the right of the petitioners to be heard on a proper case at a future time.

For reversal—BEASLEY, C. J., DEPUE, DIXON, DODD, GREEN, LATHROP, SCUDDER, VAN SYCKEL, WOODHULL. 9.

For affirmance—KNAPP, LILLY. 2.